UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL 06-119-KKC

UNITED STATES OF AMERICA                                         PLAINTIFF


VS:                         RECOMMENDED DISPOSITION OF
                                 MOTIONS TO SUPPRESS

JERRY LEE SHACKLEFORD                                            DEFENDANT

* * * * * *

In this action, Defendant faces eleven counts in an indictment returned by the Grand Jury. The indictment specifically charges Defendant with ten counts of knowingly receiving, and one count of knowingly possessing, visual depictions of a minor engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2) & (a)(4)(B).

Defendant has moved to suppress both the results of a police search and statements made by Defendant under questioning by the Kentucky State Police. The Court conducted a suppression hearing on December 20, 2006. Per the request of Defendant, the Court also scheduled and conducted a second suppression hearing on January 5, 2007, to deal with distinct parts of the relevant proof on the specific issues raised. The Court also has received and reviewed briefing from the parties on all issues.

The Court confronts three distinct suppression issues raised by Defendant. First, Defendant argues that the state search warrant at issue is not valid because the judge failed to sign the jurat on the warrant application, rendering the warrant unsworn in violation of the Fourth Amendment's warrant clause. That warrant secured the materials supporting the indictment. Second, Defendant

-1-

argues that KSP Det. Jacqueline Pickrell, who interviewed Defendant around the time of the search and secured from him incriminating statements, got such statements through dishonest and psychologically coercive means, thus invalidating Defendant's consent to answer questions. Finally, and as an alternative challenge to the warrant and resulting evidence, Defendant argues that the warrant is invalid because the information in the warrant application was "stale" and thus did not support warrant issuance.

The Court afforded both Defendant and the United States a full and fair opportunity to present evidence, cross-examine witnesses, tender relevant materials, and make argument at both hearings. Based on the record, and considering the standards and burdens of production and proof applicable in the suppression context[1], the Court makes the following recommended findings of fact and conclusions of law.

*I. The oath requirement*

The Affidavit in this matter bears only Det. Pickrell's signature. *See* Exhibit A. The state judge signed and issued the search warrant, but failed to sign and date the jurat affixed to the end of the supporting Affidavit. *See id.* On this basis, Defendant concludes that the Affidavit is unsworn and that the search warrant is invalid under the federal constitution as a result. *See, e.g.,* U.S. Const. amend. IV. ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation ....").

---

[1]

In the context of a search pursuant to a warrant, the criminal defendant has the burden on suppression. *See United States v. Wright,* 468 F.2d 1184, 1185-86 (6th Cir. 1992). The government bears the burden of proving that a defendant's consent to answer questions was valid. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226-27, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The clear proof status as to the issues before the Court renders these allocations academic, in this case.

The Court rejects Defendant's summary conclusion that Det. Pickrell was not under oath simply because the jurat affixed to the Affidavit is unsigned. An unsigned acknowledgment is not conclusive on this matter. *See United States v. Henderson*, 2005 WL 3021982, at *3 (N.D. Iowa 2005)("[T]he fact that Judge Hoover-Grinde failed to acknowledge by her signature that Officer Joecken had been placed under oath does not establish that Officer Joecken was not in fact placed under oath."); *see also State v. Colon*, 644 A.2d 877 (Conn. 1994); *Powell v. State*, 355 So.2d 1378 (Miss. 1978); *State v. Keith*, 978 S.W.2d 861 (Tenn. 1998).

In this case, Det. Pickrell unequivocally testified that the state judge placed her under oath before she offered her Affidavit in support of probable cause. Det. Pickrell further stated that she signed the Affidavit after she presented it to the judge, but failed to realize the judge did not sign the jurat. Her testimony is substantially corroborated by Det. Bertram, a fellow officer who accompanied Det. Pickrell to the judge's chambers and witnessed the events in question. Det. Bertram specifically testified that the judge swore Pickrell, Pickrell signed, and then the judge issued the warrant.

Defendant's efforts to discredit Det. Pickrell's testimony are unavailing. He emphasizes the length of time between the warrant application (in early 2006) and the hearing, but the Court believes Det. Pickrell accurately recalled the events at issue. Det. Pickrell described her meeting with the judge in great detail, and Det. Bertram substantiated the testimony. The Court is similarly unpersuaded by Defendant's weak proffer. Counsel reports that the state judge has no recollection of the events. In addition to its purely hearsay nature and limited evidentiary value, the proffer is inconclusive. It neither confirms nor refutes the testimony of Det. Pickrell.

-3-

The Court finds that Det. Pickrell's testimony is credible.  The best explanation for the unsigned jurat is inadvertent oversight.  As Det. Pickrell repeatedly testified, two separate warrant applications were before the judge that day.  The judge simply failed to record the oath he actually did administer.  As such, the Court concludes that Det. Pickrell was under oath when she offered the Affidavit to the state judge.  Additionally, the warrant application repeatedly refers to Det. Pickrell as "affiant," and the signed warrant references the "proof by affidavit having this day been made . . . by Det. Pickrell."  *See* Affidavit; Warrant.

Thus, the record establishes compliance with the Fourth Amendment, despite the unsigned jurat.  The Fourth Amendment guarantees that no warrant shall issue without probable cause supported by oath or affirmation, but the Fourth Amendment does not require the issuing judge to record or acknowledge that the affiant was under oath.  *See United States v. Henderson*, 2005 WL 3021982, at *3 (N.D. Iowa 2005).  Based on the testimony at the evidentiary hearing, the Court is satisfied that Det. Pickrell in fact was under oath.  Under these circumstances, the unsigned acknowledgment does not impact the validity of the warrant.  *See id.*

Alternatively, the Court believes the *Leon* "good faith" exception would apply to this situation.  The exclusionary rule is designed to deter police misconduct rather than the errors of judges and magistrates.  *See United States v. Leon*, 468 U.S. 897, 916, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. Chaar*, 137 F.3d. 359, 361 (6th Cir. 1998).

The record contains no indication of police misconduct in this matter.  Det. Pickrell testified that she did not even realize the judge had failed to sign the jurat, and nothing suggests she should have been aware of the omission.  Rather, her testimony reflects an innocent clerical error by the state judge.  As Det. Pickrell explained, the judge evaluated two separate warrant applications on the

-4-

day in question.   In all likelihood, the state judge simply overlooked the jurat in the mix of paperwork.

Plainly, the purpose of the exclusionary rule, which is to deter police misconduct, does not arise in the context of this case.   Indeed, other federal courts have used the "good faith" exception where the issuing judge mistakenly left the supporting affidavit unsworn or unsigned.   *See United States v. Smith*, 63 F.3d 766, 769 (8th Cir. 1995)(applying *Leon* where *"the* jurat following the signature of [the agent] was not signed by the Magistrate Judge" because of "inapplicability of the exclusionary rule to clerical mistakes by judges"); *United States v. Richardson*, 943 F.2d 547, 550-51 (5th Cir. 1991)(deciding not to apply the exclusionary rule where a judge accidently failed to administer the oath because the rule's purpose of deterrence would not be served by penalizing the officer for the judge's mistake); s*ee also United States v. Hessman*, 369 F.3d 1016, 1019-23 (8th Cir. 2004);   *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988).   For these reasons, the Court finds the unacknowledged supporting Affidavit would not remove this warrant from the *Leon* "good faith" exception.

## II.  Psychological coercion

The Court conducted one hearing devoted only to the psychological coercion issue.   At that hearing, the United States presented testimony from Det. Pickrell.   The Defendant actually testified in support of the motion, limiting his testimony to the circumstances surrounding statements Defendant made to Det. Pickrell at the time of the search.

Defendant's argument is that Det. Pickrell fabricated a story about a missing, imperilled child to goad Defendant into revealing incriminating information.   Although Defendant admitted that Det. Pickrell provided a proper *Miranda* warning, Defendant argues that, as a matter of due process, Det.

Pickrell coerced Defendant into making incriminating statements by overbearing his will with false, deceitful, and misleading stories and threats.  Defendant's version is as follows:

> Well, it's been a long time ago, so I can't remember word for word.  But, I know she told me that – something about a girl – I don't know whether she was from New York, or Kentucky, or something, but it was going to come from one place to the other.  And this guy had said he was going to murder her or something like that – and asked me something about if I had been in on it or something – or like that, and I told her no.  And, I was kind of, you know, worried, for the point and fact of it is that I didn't want no murder or nothing like that on me.  So, that's when I told her my screen name and stuff because I wanted to clear myself of that.

Tr. at 33-34.[2]  Thus, according to Defendant's suppression theory, Det. Pickrell relayed a fabricated story indicating that a girl was in danger of imminent death and pressured Defendant to talk by use of that story.  Defendant talked, he said, "because I didn't want to see nobody get hurt."  Tr. at 45.  To Defendant, the conduct of Det. Pickrell is "coercion at its worst."

Defendant also vaguely referenced an article in the *Lexington Herald-Leader* that ran at some point after the interview in question.  Defendant suggests that the article referred to a missing girl that had been found and had circumstances similar to the story Det. Pickrell allegedly used on Defendant.  Notably, Defendant produced no such story to the Court.

Det. Pickrell categorically denied the descriptions by Defendant.  Indeed, in no uncertain terms, Pickrell denied giving Defendant any information about a missing girl.  Pickrell also flatly denied lying to Defendant, attempting to pressure Defendant through fabrication, or otherwise

---

[2]On cross, the version was:
She told me something about – I can't recall if it was from Kentucky, or from New – New York. It was one, or the other, vice versa. The – the –there was a girl missing and there was some guy on the computer, or something – or, it said something about he was going to kill her, or something, or other, and – and asked me if something – if it was me, or asked me if I was in on it, and I told her no, I wasn't.  And, that was the whole reason I give her my screen name...
Tr. at 38.

employing trickery or other coercion to gain information. Det. Pickrell related that when she encountered Defendant at the home, he asked to talk to her out of earshot of others in the home. Det. Pickrell related Defendant's *Miranda* rights, and Defendant waived those rights and freely spoke to Pickrell.

According to Det. Pickrell, relative to Defendant, she followed the standard investigative checklist and mode of interview she regularly employed for investigations of this nature. Pickrell described that she began the inquiry by covering the *Miranda* rights and seeking a waiver. Then, she ran through standard questions about computer hardware and ISP use, before moving to specific inquiries about the matter prompting police involvement. Pickrell reported that she never lies to a suspect, and she emphatically repeated that she told Defendant no lies as part of the interview.

Det. Pickrell did record the interview with Defendant, and that recording would be of great benefit to all concerned, if it were available. Pickrell relates that she performed two interviews on the date in question. She typically would have copied those interviews–recorded on a digital recorder–onto a disk and placed the disk into Defendant's file. Unfortunately, on this occasion, Pickrell mistakenly copied the interview of the other defendant twice, placing a copy of that interview in the file of that defendant as well as into the file of Defendant Shackleford. Det. Pickrell failed to copy the interview with Shackleford, and the digital recorder long ago wrote over the Shackleford interview. Pickrell did not discover the error for months after the interview. Defendant implies impropriety in this scenario, but the Court finds that the absence of the interview results from an honest administrative mistake.

Det. Pickrell reported that she conducted the preserved but factually-unrelated interview from the same day in the same manner she conducted Defendant's interview. At Defendant's request, the

Court thus directed the United States to supply Defendant and the Court a copy of that "model" interview for review.

The other interview, which involved Michael Hodson (*United States v. Hodson,* London Crim. 06-117-DCR), fully supports the method Pickrell described using with Defendant. She proceeds with the suspect in that case in a measured and professional manner, beginning with a *Miranda* warning and moving through a series of factual questions about that suspect's computer system and computer usage. Det. Pickrell clearly and factually relates the reason for police involvement, and nothing even hints at the use of psychological or other coercive measures during that interview. Though the interviews are not in any way connected as a matter of fact, other than by date, the evidence of Det. Pickrell's investigative style buttresses her testimony in this case and undermines the defense theory.

As defense counsel describes, this issue reduces into a swearing match between Det. Pickrell and Defendant. No one else witnessed the event, and the recorded interview is irretrievably lost. The Court has evaluated the respective testimony and the circumstances of each witness and finds that Det. Pickrell's story is decidedly more credible.

Defendant's vague story is fanciful and self-serving. He provides few details about exactly how Pickrell goaded him into talking, providing instead a series of general allegations, qualified by "or something like that." Additionally, Defendant's position changed dramatically even during the hearing. First, Defendant swore that Pickrell never tied the fabricated "missing girl" story to Defendant's computer use (raising a significant doubt about the logical purpose of lying to Defendant in the first place). On cross, Defendant specifically stated:

> No – she – never said nothing about it being the picture that – that was supposedly
> being sent . . . I think she asked me if I was in on it [i.e., the missing girl] but she
> didn't ask me nothing about no screen name.

Tr. at 40. Thus, Defendant testified that Pickrell said nothing to link the missing girl to Defendant's

computer or computer use. Later, perhaps realizing the need for the story to bond with the reason

for the search, Defendant amended his position:

> She probably – no, she probably had a few questions about my computer and stuff
> after she told me that, you know.

Tr. at 41-42.

Many factors lead the Court to reject the defense story. The factors include Defendant's

inconsistencies, the nonspecific nature of the story, Defendant's inherent bias on the issue, and

Pickrell's clear description of the interview (which matches the process in the other,

contemporaneous interview). The Court finds as a fact that Det. Pickrell's version warrants belief,

and no credible factual basis supports Defendant's argument for suppression. The Court therefore

does not reach the legal analysis applicable to a psychological coercion theory.

*III. Staleness*

On June 9, 2005, New York authorities confiscated the computer of John Reap, a resident

of Rome, New York. A forensic analysis of the computer revealed that an AOL user, identified as

"Stuffin Muffin 3," transmitted a sexually explicit image involving a minor to Reap on May 19,

2005. Authorities subpoenaed AOL on June 16, 2005 for records relating to the "Stuffin Muffin 3"

screen name. According to AOL records, the screen name was registered to Tanya Lawson, residing

at Route 3 Box 157, Middlesboro, Kentucky 40965. *See* Exhibit A.

Roughly six months later, in December of 2005, the authorities in New York relayed this information to Det. Pickrell in Kentucky. On January 19, 2006, Det. Pickrell confirmed, through KSP Intelligence, that Tanya Lawson resided at the address indicated by the AOL records. Intelligence further showed that Defendant lived with Lawson. Based on the foregoing information, Det. Pickrell sought, secured, and executed a search warrant for the Middlesboro residence on January 26, 2006.

Defendant contends that the information relating to the May 19, 2005 illicit online exchange became stale by the time authorities applied for the warrant on January 26, 2006. After removing this evidence on account of staleness, Defendant concludes the Affidavit fails to establish probable cause.

Information may become stale because "probable cause to search is concerned with the facts relating to a presently existing condition." *See United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)(citations omitted). However, the mere "length of time between the events listed in the affidavit and the application for the warrant, while clearly salient, is not controlling." *Id*. Rather, the circumstances of each case determine whether information contained in an affidavit is stale. *See Sgro v. United States*, 287 U.S. 206, 210-11, 53 S.Ct. 138, 77 L.Ed.2d 260 (1932).

The Sixth Circuit identifies four factors that are relevant to this determination: the character of the crime; the circumstances of the alleged criminal; the thing to be seized; and the place to be searched. *See United States v. Abboud*, 438 F.3d 554, 572-73 (6th Cir. 2006) (citing *Spikes*, 158 F.3d at 923). Application of these factors, in this case, indicates that the information supporting the warrant application was not stale.

-10-

The first factor considers whether the crime at issue is a one-time occurrence or an ongoing activity. *See Abboud*, 438 F.3d at 572. "Evidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001). The Affidavit in this case reports a single incident of criminal activity–the transmission of a sexually explicit image of a minor. There is no evidence that Defendant repeatedly exchanged illicit images or had an ongoing interest in such material. Instead, the Affidavit describes a one-time occurrence. This factor suggests staleness. *See Abboud*, 438 F.3d at 573.

The second factor addresses whether the suspected criminal is "nomadic" or "entrenched." *See Abboud*, 438 F.3d at 572. Indication that a suspect moves from place to place decreases the probability of finding evidence at a given location over the passage of time. *See id.* at 573. In this case, AOL records and KSP Intelligence confirmed that the individual registered to the "Stuffin Muffin 3" screen name resided at the Middlesboro residence both at the time of the illicit online transmission *and* when authorities sought the search warrant. Moreover, crimes of the type alleged are often "tied to a place of privacy [and] seclusion," such as a home. *See United States v. Wagers*, 452 F.3d 534, 540 (6th Cir. 2006). Persons who possess or trade in child pornography have a recognized propensity to collect and store materials related to their activities. *See United States v. Riccardi*, 405 F.3d 852, 861 (10th Cir. 2005)("This proposition is not novel in either state or federal court: pedophiles, preferential child molesters and child pornography collectors maintain their materials for significant periods of time."); *United States v. Miller*, 450 F.Supp.2d 1321, 1335 (M.D. Fla. 2006); *United States v. Lamb*, 945 F.Supp. 441, 460 (N.D.N.Y. 1996). For these reasons, there is a fair probability, based on the information in the Affidavit, that authorities would find evidence

-11-

of the sexually explicit image at a single location–on a computer at the Middlesboro residence. *See*

*Abboud*, 438 F.3d at 572-73. This factor cuts against staleness.[3]

The third factor considers whether the nature of the alleged evidence is "perishable," "easily

transferable," or "of enduring utility to its holder." *See Abboud*, 438 F.3d at 573. Child pornography

often has an "enduring" quality to the perpetrator. In the staleness context, courts have recognized

that pedophiles and child pornography collectors commonly hoard and retain illicit materials. *See*

*Riccardi*, 405 F.3d at 861; *United States v. Keller*, 2006 WL 3392952, at *5 n.2 (W.D. Tenn. 2006).

These courts have concluded that information relating to child pornography or sexual exploitation

has greater durability. *See id.*

---

[3]

Defendant strenuously challenged Det. Pickrell to explain how she "knew" authorities would find evidence of the sexually explicit image on a computer at Defendant's residence some eight months after the reported online transmission. Defendant argues that the computer involved in the online exchange could have been located outside Defendant's residence or at least replaced during the eight months before authorities executed the warrant.

Defendant's arguments are misguided. It is not necessary for authorities to establish absolute confidence in the outcome of their search. Rather, circumstances that "indicate a *fair probability* that evidence of a crime will be located on the premises of the proposed search" is sufficient to demonstrate probable cause for a search warrant. *See Abboud*, 438 F.3d at 572 (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)(emphasis added)).

In this case, AOL records connected the screen name to the Middlesboro address. In addition, KSP Intelligence confirmed that the same individual identified by the AOL records resided at the Middlesboro address when authorities executed the warrant. Although it is possible the perpetrator accessed the internet from a computer outside the suspected residence, it is reasonable to assume that a current occupant of the home conducted the online exchange and would use the privacy and seclusion of the residence to transmit the image. *See Wagers*, 452 F.3d at 540-41. There is also a chance that the perpetrator replaced the computer involved in the online exchange during the eight months before the search, but Defendant greatly overestimates the effect of this possibility. There still remains at least a "fair probability" that this computer would be located at the Middlesboro residence eight months later. For these reasons, the Court rejects the arguments raised by Defendant.

Thus, staleness in child pornography cases may be measured in years–not months. *See Riccardi*, 405 F3d at 860-61 (finding five-year old information not stale in child pornography case); *United States v. Irving*, 452 F.3d 110, 125 (2d Cir. 2006)(finding two-year old information not stale); *United States v. Newsom*, 402 F.3d 780, 783 (7th Cir. 2005)("Information a year old is not necessarily stale as a matter of law, especially where child pornography is concerned."); *United States v. Shields*, 458 F.3d 269, 279 n. 7 (3d Cir. 2006)(finding information nine months old not stale); *United States v. Hay*, 231 F.3d 630, 636 (9th Cir. 2000)(finding six month period between transmission of child pornography images and warrant did not render information stale); *United States v. Sherr*, 400 F.Supp.2d 843, 846-47 (D. Md. 2005)(finding eight month delay between defendant's receipt of child pornography and the issuance of warrant did not indicate staleness); *see also United States v. Ramsburg*, 114 Fed. Appx. 78, 82 (4th Cir. 2004)(finding email image of child pornography obtained over six years before warrant did not become stale). In light of the nature of the evidence and overwhelming case law support, this factor strongly suggests that the eight month window between the May transmission and January warrant did not render the supporting basis stale.[4]

The final staleness factor considers whether the place identified by the search warrant is a mere criminal forum of convenience or a secure operational base. *See Abboud*, 438 F.3d at 573. There is a greater probability of finding evidence at a location that is "at the heart of the criminal charges." *See id.* at 574. From the information provided in the Affidavit, the Court cannot definitively determine whether the perpetrator exchanged the image from a computer inside the

---

[4]

In addition, Defendant conducted the online chat via computer. The technical capability to retrieve even deleted evidence from computer hard drives also cuts against staleness.

Middlesboro residence or used the residence to engage in other illicit activities. As stated, however, criminal activity involving child pornography is often conducted in a private setting, such as a home, by persons who commonly collect and store their materials. *See Wagers* 452 F.3d at 540 (noting that "viewing child pornography is much more tied to a place of privacy, seclusion, and high-speed Internet connectivity," such as a home); *Riccardi*, 405 F.3d at 861; *Miller*, 450 F.Supp.2d at 1335; *Lamb*, 945 F.Supp. at 460. Thus, there is a reasonable likelihood that the perpetrator in this case used a computer at the Middlesboro residence to store and transmit the illicit image in question. Though a weaker factor, the inference in support of conduct at the residence indicates against a finding of staleness.

In sum, the factors identified by the Sixth Circuit indicate that evidence relating to the May 19, 2005 transmission did not become stale during the eight months before authorities sought and executed the search warrant. Although the Affidavit does not indicate ongoing criminal activity, evidence of child pornography, particularly involving a computer, requires a staleness analysis sensitive to technology and to the alleged criminal activity at issue. *See Miller,* 450 F.Supp.2d at 1335 ("[T]raditional concepts of staleness that might apply to the issuance of search warrant ... do not mechanically apply to situations, as here, where the object of the search is for images of child pornography stored on a computer."). More than any other factor, the nature of the evidence strongly suggests the information in the Affidavit did not become stale. Thus, the Court rejects Defendant's argument that the Affidavit fails to establish probable cause due to staleness.

## RECOMMENDATION

For all the reasons stated, the Court recommends that the District Court deny the Motions to Suppress filed by the Defendant. *See* DE #s 29 and 36.

-14-

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of said statute. Within ten days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court, with any written responses thereto being filed within ten days.

This the 9th day of January, 2007.

Signed By:

**Robert E. Wier**  $\mathcal{R}\mathcal{E}\mathcal{W}$

**United States Magistrate Judge**

-15-